UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X
                       :

**METE KARABAS**,
                       :

           Plaintiff,     :   **MEMORANDUM DECISION AND ORDER**

       – against –     :   24-CV-2722 (AMD) (VMS)

                       :

**TC HEARTLAND LLC**,
                       :

          Defendant.   :

--------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The plaintiff brings this putative class action against the defendant alleging it deceptively marketed its stevia-based sweetener as "100% Natural." According to the plaintiff, the sweetener's two ingredients — stevia leaf extract and erythritol — are synthetic because of the process through which the defendant produced the ingredients, which the plaintiff says is not natural. The plaintiff alleges violations of New York and New Jersey consumer protection laws.

Before the Court is the defendant's motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons that follow, the Court grants the motion.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from the allegations in the complaint, which the Court "accept[s] as true" on a motion to dismiss. *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020) (citation omitted).

The defendant manufactures, markets, and sells "Splenda Naturals Stevia Zero Calorie Sweetener" ("Splenda Naturals Stevia"), a sugar alternative which the defendant labels "100% Natural."  (ECF No. 1 ¶¶ 1, 9–15.)



 

(*Id.* ¶¶ 1, 13.)

The back of the package includes two statements.  The first, near the top of the package reads, "100% Natural Ingredients, Nothing Artificial."  The second statement, in smaller print, says:

> Splenda Stevia Sweetener is made with two non-GMO sweeteners: stevia leaf extract and erythritol. Stevia leaves are steeped in water to extract the sweet parts of the leaf and then undergo a process to separate, fil[t]er and purify the extract. Erythritol is produced by a fermentation process. Please see our website for more information on our natural standard: www.splenda.com/naturals.

(*Id.* ¶ 41.)[1]



(*Id.* ¶ 42.)

---

[1] The complaint cites statements on the defendant's website, but does not allege that the plaintiff "viewed or relied upon" anything on the website before he bought the defendant's product.  *Levy v. Hu Prods. LLC,* No. 23-CV-1381, 2024 WL 897495, at *6 (S.D.N.Y. Mar. 1, 2024) (citations omitted). Accordingly, the Court considers only the wording on the package.

Splenda Naturals Stevia contains two ingredients: stevia leaf extract and erythritol.  (*Id.* ¶ 25.)  According to the plaintiff, the defendant does not produce erythritol the way it is produced in nature (*id.* ¶ 40), and the process of producing stevia leaf extract is more complex and industrial than the description on the package.  The plaintiff says that the erythritol is "synthetically manufactured by first chemically extracting starch from corn and then converting the starch to glucose through the biochemical process of enzymatic hydrolysis."  (*Id.*)  The glucose is fermented and "[t]he fermentation broth is sterilized, filtered, and purified to produce erythritol crystals."  (*Id.*)

The plaintiff describes the following process,[2] although he does not say whether the defendant uses this process:

- **Step 1 – "Extraction with hot water":** "Dry leaves [of the stevia plant] are loaded into a trough," the dry leaves are boiled in hot water, and steviol glycoside is extracted from the dry leaves "by thorough mixing."  (*Id.* ¶ 28.)

- **Step 2 – "Clarification by Electrocoagulation":** The "liquid extract" containing steviol glycoside is "clarified by either chemical- or electro-coagulation and filtering in an industrial tank," removing "gelatinous materials, plant pigments, tannins and polyphenols, emulsified oily and waxy materials and proteins."  (*Id.* ¶ 29.)

- **Step 3 – "Filtration of coagulated liquid":** The water extract from Step 2 is "filtered by an industrial filter press . . . to remove coagulated contaminants."  (*Id.* ¶ 30.)

- **Steps 4, 5, and 6 – "Clarification of the water [e]xtract":** The "filtered water extract" from Step 3 is "clarified through (i) an activated carbon filter, (ii) a cation exchange column, then (iii) an anion exchange column."  (*Id.* ¶ 31.)

- **Step 7 – "Adsorption on resin and elution with ethanol":** The "clarified water extract" from Step 6 is "passed through a special macro-porous non-ionic resin column," and through this process, "the steviol glycoside in the water gets adsorbed on the resin surface, which becomes saturated with steviol glycoside."

---

[2] The plaintiff also includes photographs of what seem to be different parts of a factory but does not allege that it is the defendant's factory.

(*Id.* ¶ 32.)  Next, a "water-immiscible solvent, such as pure ethanol . . . passe[s] through the column[]" and "takes up the steviol glycoside from resin."  (*Id.* ¶ 33.)

- **Step 8 – "Concentration of alcoholic solution":**  The "resulting alcoholic solution of steviol glycoside" from Step 7 is "concentrated with a nanofiltration membrane device."  (*Id.* ¶ 34.)

- **Step 9 – "Concentration of alcoholic solution":**  The "resulting mixture" from Step 8 is "purified through a series of industrial processes."  (*Id.* ¶ 35.)

- **Step 10 – "Syrup decolorization":**  "[A]lcoholic TSG syrup," which is a "byproduct of th[e] process" from Step 9, is "decolorized" using an "activated carbon filter," "plate and frame filter press," and "plate heat exchanger."  (*Id.* ¶ 36.)

- **Step 11 – "Spray drying":**  The "hot, decolorized alcoholic TSG syrup" from Step 10 "is spray dried in industrial equipment."  (*Id.* ¶ 37.)

## II.    Procedural History

The plaintiff brought this putative class action lawsuit on April 11, 2024.  (ECF No. 1.)  The plaintiff maintains that the "100% Natural" label is "intended to appeal to consumers like him, who are interested in natural foods."  (*Id.* ¶ 59.)  He says that these consumers look for "natural ingredients in foods" because they want "to live a healthier lifestyle, the perceived benefits in avoiding disease and other chronic conditions, and to avoid chemical additives."  (*Id.* ¶ 18.)  Reasonable consumers, the plaintiff argues, believe that "'all' or '100%' natural products . . . do not contain man-made, synthetic ingredients, nor ingredients subject to harsh chemical processes."  (*Id.* ¶ 19.)

The plaintiff, an "avid tea and coffee drinker" who "prefers to sweeten his tea and coffee with all-natural nonnutritive sweeteners," claims that he purchased Splenda Naturals Stevia because the defendant represented that it was "100% Natural."  (*Id.* ¶¶ 57–60.)  The defendant did not disclose on the package or the website that the product contained "synthetic" ingredients, and its "disclaimers and website explanations were insufficient to dispel the misrepresentation" that the product was "100% Natural."  (*Id.* ¶ 44.)  The plaintiff alleges that he paid a premium for

the defendant's product because he thought that it did not contain "synthetic" ingredients.  (*Id*. ¶ 61.)  The plaintiff "would not have purchased Splenda Naturals Stevia, or would not have been willing to pay the price he paid, if he knew that the '100% Natural' labeling claim was false and misleading in that the product contains synthetic ingredients."  (*Id.* ¶ 61.)

The plaintiff also alleges that the defendant "knows, or has been negligent in not knowing, that the Splenda Naturals Stevia Products are not '100% Natural.'"  (*Id*. ¶ 155.)  The plaintiff cites Vice President of Marketing, Kim Holdworth's statement in an interview that the phrase "all-natural products" "is very meaningful to consumers shopping the non-nutritive sweetener category."  (*Id*. ¶ 16.)  The plaintiff also cites surveys, which he says show that "'natural' is one of the most compelling labeling claims to consumers."  (*Id*. ¶ 18 (citing David L. Ter Molen & David S. Becker, *An "All Natural" Dilemma: As the Market for "All Natural" Foods Continues to Grow, So Do the Risks for the Unwary* (Nov. 27, 2012), at 2.).)  The defendant's use of its own "natural standard" was an attempt "to avoid liability."  (ECF No. 1 ¶ 41.)  One of the defendant's competitors was sued in early 2023, after which the defendant removed the "100% Natural" label and replaced it with "U.S. Grown" or "Plant Based."  (*Id*. ¶ 54.)[3]

The plaintiff brings this action on behalf of people from different states and alleges a national class as well as New York and New Jersey subclasses.  He alleges violations of the following state laws:

- New York's General Business Law ("GBL") §§ 349 and 350 (*id.* ¶¶ 79–91 (Counts 1 and 2));

- New Jersey's Consumer Fraud Act ("CFA"), N.J.S.A. §§ 56:8–1, *et seq*. (*id*. ¶¶ 92–101 (Count 3));

---

[3] The complaint does not identify the competitor or provide any other information regarding the lawsuit.

- New Jersey's Breach of Express Warranty, N.J. Stat. Ann. ¶ 12A:2–313 (*id.* ¶¶ 102–08 (Count 4)); and

- Intentional Misrepresentation (*id.* ¶¶ 119–25 (Count 6)).[4]

The defendant moves to dismiss the complaint. It maintains that the plaintiff has not established that its labeling was deceptive, or that it would have misled a reasonable consumer. In addition, the defendant says that the plaintiff has not sufficiently alleged that he suffered any injury. The plaintiff opposes. (ECF No. 21.)

## DISCUSSION

### I. Judicial Notice

At the motion to dismiss stage, the court "is generally limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated into the complaint by reference." *Williams v. Time Warner Inc.*, 440 F. App'x 7, 9 (2d Cir. 2011) (quoting *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002)). The court may consider any "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in [the] plaintiff['s] possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," as long as the plaintiff relied on the "terms and effect of a document in drafting the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). A court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R.

---

[4] On July 18, 2024, the plaintiff voluntarily dismissed the negligent misrepresentation claim (Count 5), and unjust enrichment claim (Count 7). (ECF No. 17.) He also withdrew the request for an injunction. (*Id.*)

Evid. 201(b)(2).  The court may also take judicial notice of documents publicly filed in other cases.  *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

The defendant asks the Court to take judicial notice of seven exhibits, including Food and Drug Administration ("FDA") and United States Department of Agriculture ("USDA") publications, settlement documents from *Howerton v. Cargill Inc.*, Case No. 1:13-CV-336 (D. Haw.), and excerpts from the defendant's website (https://www.splenda.com/products/naturals). The Court takes judicial notice of the USDA and FDA publications.  *See, e.g.*, *In re Frito-Lay N. Am., Inc. All Natural Litig.*, No. 12-CV-2413, 2013 WL 4647512, at *4 (E.D.N.Y. Aug. 29, 2013) ("Courts are permitted to take judicial notice of the contents of the Federal Register and the Code of Federal Regulations and guidance from administrative agencies."); *Porazzo v. Bumble Bee Foods, LLC*, 822 F.Supp.2d 406, 411–12 (S.D.N.Y.2011) (taking notice of agency guidance documents, consumer advisory, backgrounder, and letters because they were available on FDA website).

In addition, the Court takes judicial notice of the settlement documents but "only to determine what the documents state[ ]" — not to accept "the truth of their contents," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  The Court does not consider the excerpts from the defendant's website because, as noted above, the complaint does not allege that the plaintiff "viewed or relied upon" the website "when purchasing the products."  *Levy*, 2024 WL 897495, at *6 (citations omitted).

## II.    Rule 12(b)(1)

### a.    Legal Standard

A district court must dismiss a complaint if the plaintiffs have not established standing. Rule 12(b)(1); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  "At the pleading stage, [the

plaintiffs] have the burden of alleging facts that affirmatively and plausibly suggest that they have standing to sue." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 154 (E.D.N.Y. 2018) (cleaned up) (citing *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)). Plaintiffs have standing if they have pleaded a case or controversy in which they have a personal stake in the outcome. *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l*, 790 F.3d 411, 417 (2d Cir. 2015). To have standing, "(1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision." *Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 239 (2d Cir. 2016) (citation omitted). The injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted). A "particularized" injury "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1).

 **b.** **Standing**

 The defendant argues that the plaintiff has not pled a cognizable injury because he does not plausibly allege that "the product was 'worth less' than what he paid and that he 'did not receive what [he] paid for' when he purchased the product." (ECF No. 19-1 at 31 (quoting ECF No. 1 ¶¶ 64–65).) The defendant cites the product's label, which describes the "ingredients the product contains, how those ingredients are processed, why TC Heartland considers them to be 'natural,' and where a consumer can find more information." (ECF No. 19-1 at 28.) According to the defendant, the plaintiff's "'subjective disappointment' that the product did not satisfy his definition of 'natural' does not amount to a legally cognizable injury." (ECF No. 19-1 (citing *Belcastro v. Burberry Ltd.*, No. 16-CV-1080, 2017 WL 5991782, at *1 (S.D.N.Y. Dec. 1, 2017); *Tyrnauer v. Ben & Jerry's Homemade, Inc.*, 739 F. Supp. 3d 246, 255 (D. Vt. 2024)).) In addition, the defendant argues that the plaintiff's "price premium injury" claim fails because he

does not allege that there are "comparable products that satisfy [his] definition of '100% Natural.'"  (ECF No. 19-1 at 31.)  The defendant says that the plaintiff must allege that the sweetener "commanded a price premium relative to comparable products that did not include the alleged false and misleading labeling."  (*Id*. (quoting *Kelly v. Beliv LLC*, No. 21-CV-8134, 2024 WL 1076217, at *10 (S.D.N.Y. Mar. 12, 2024) (emphasis omitted)).)

The defendant's standing arguments are not persuasive.  "One method of demonstrating actual injury in the consumable goods context is by showing that the plaintiff paid a 'price premium' — that is, as a result of the defendant's deception, the plaintiff paid more for a product than he otherwise would have."  *Eidelman v. Sun Prods. Corp.*, No. 21-1046, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022); *see also Axon v. Florida's Nat. Growers, Inc.*, 813 F. App'x 701, 703–04 (2d Cir. 2020) ("Axon [] suffered an injury-in-fact because she purchased products bearing allegedly misleading labels and sustained financial injury — paying a premium — as a result.").  The plaintiff's allegations fit this theory.  The plaintiff alleges that he would have paid less for the Splenda product or not purchased it at all had he known that it contained "synthetic ingredients."  (ECF No. 1 ¶¶ 26–40, 57–68.)  The plaintiff also alleges that the defendant markets its product as "100% Natural" because "it knows the claim is compelling to consumers, who are willing to pay more for all-natural products."  (*Id.* ¶ 16.)  These allegations permit the inference "that the [product] sells for a higher price than a comparable product because of [its] use of the deceptive claim."  *Eidelman,* 2022 WL 1929250, at *1; *see also Levy v. Hu Prods. LLC*, No. 23-CV-1381, 2024 WL 897495, at *4 (S.D.N.Y. Mar. 1, 2024) (same).  The fact that the plaintiff did not identify "the prices of competing products to establish the premium that []he paid 'is not fatal to [his] claim' at this stage of the proceedings."  *Axon*, 813 F. App'x at 704.

Accordingly, the plaintiff has sufficiently alleged an injury-in-fact, and the defendant's motion to dismiss on that basis is denied.

### III.    Rule 12(b)(6)

#### a.    Legal Standard

A court deciding a motion to dismiss accepts as true the factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

#### b.    New York Law Deception Claims

The defendant moves to dismiss the plaintiff's claims under Sections 349 and 350 of the General Business Law. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service," N.Y. Gen. Bus. Law § 349(a), and Section 350 prohibits "false advertising" that is "misleading in a material respect," *id.* §§ 350, 350-a(1). "To assert a claim under either section, a plaintiff must establish that [1] the defendant engaged in consumer[-]oriented conduct, [2] that is materially misleading, and [3] plaintiff was injured as a result of the deceptive act or practice." *Reyes v. Crystal Farms Refrigerated Distrib. Co.*, No. 18-CV-2250, 2019 WL 3409883, at *3 (E.D.N.Y. July 26, 2019) (quoting *Bowring v. Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 390 (E.D.N.Y. 2017)).

New York courts apply "an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (citation omitted). To avoid dismissal, "a plaintiff must do more than plausibly allege that a label might conceivably

be misunderstood by some few consumers." *Valencia v. Snapple Beverage Corp.,* No. 23-CV-1399, 2024 WL 1158476, at *2 (S.D.N.Y. Mar. 18, 2024) (citation omitted). "Instead, a plaintiff must plausibly allege that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled." *Id.* (internal quotation marks and citation omitted). "While the question of whether a reasonable consumer would be deceived by a 'natural' label is not typically resolved at the motion to dismiss stage, dismissal is appropriate when the complaint fails to allege facts that state a plausible claim for relief." *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d 170, 183 (E.D.N.Y. 2018), *aff'd sub nom. Axon*, 813 F. App'x 701. The defendant maintains that the Sections 349 and 350 claims must be dismissed, because the plaintiff has not sufficiently alleged that the defendant misrepresented the ingredients in its product or shown that the language on the package was likely to mislead a reasonable consumer.

There is no dispute that the defendant engaged in consumer-oriented conduct, or, as explained above, that the plaintiff has sufficiently alleged an injury. *See Fishon v. Peloton Interactive, Inc.*, No. 19-CV-11711, 2020 WL 6564755, at *10 (S.D.N.Y. Nov. 9, 2020) ("Th[e] [injury] prong may be satisfied through an allegation that a plaintiff overpaid for the product, or, stated differently, 'by a claim that a plaintiff paid a premium for a product based on [the] defendants' inaccurate representations.'" (citation omitted)); *see also Segedie v. Hain Celestial Grp., Inc.*, No. 14-CV-5029, 2015 WL 2168374, at *12 (S.D.N.Y. May 7, 2015) ("Plaintiffs have also adequately alleged injury by claiming that they paid a price premium that they would not have paid if the products were not labeled 'natural' or 'all natural.'").

The dispute centers on the second element: whether the product's "100% Natural" label would mislead a reasonable consumer who is acting reasonably. The plaintiff says that the label

would mislead reasonable consumers, not because of the ingredients — stevia leaf extract and erythritol — in and of themselves, which the plaintiff concedes are natural.  The plaintiff's complaint is that "the processes used to produce these ingredients do not occur naturally in nature; rather, they are synthetic processes undertaken in industrial factories."  (ECF No. 1 ¶ 25.) The plaintiff devotes 11 pages of the complaint to describing the process by which stevia leaf extract is made, including charts and photographs of what appear to be a factory.  (*Id.* ¶¶ 28–37.) The plaintiff claims that this process transforms the end product into a synthetic product, even though none of the chemicals used in production end up in the product itself.

The plaintiff's "generalized" discussion about the manufacturing process is not sufficient to show that the defendant's product is synthetic.  *See Hawkins v. Coca-Cola Co.*, 654 F. Supp. 3d 290, 305 (S.D.N.Y. 2023) ("Plaintiff plainly makes bare, unsubstantiated allegations about the possibility that the Product contains artificial DL-Malic acid, without any additional factual support from product testing."); *Myers v. Wakefern Food Corp.*, No. 20-CV-8470, 2022 WL 603000, at *4 (S.D.N.Y. Mar. 1, 2022) (plaintiff claiming that product was tested but "fail[ed] to provide any details whatsoever about [what] this laboratory test entailed" such as "describ[ing] the testing methodology followed, the specific date, time, or place of the testing, who conducted the testing, the qualifications of the testers, etc.").  Moreover, while the plaintiff refers to the Splenda product as "synthetic," he does not allege that the chemicals used in production were added to the product.  *Axon*, 354 F. Supp. 3d at 183 (collecting cases in which courts have denied motions to dismiss "natural claims" because "the defendant is accused of introducing unnatural *ingredients* into a product labeled 'natural'" (emphasis in original)); *see also Axon*, 813 F. App'x at 705 ("Unlike 'natural,' the words 'pure' and '100% natural' indicate the absolute absence of contaminants." (citing Pure, Merriam-Webster Dictionary, http://merriam-

webster.com/dictionary/pure (defining "pure" as "free from dust, dirt, or taint"))).  "[T]he
Complaint's allegations that the Product contains [synthetic ingredients] are conclusory
statements that the Court is not required to accept."  *Hawkins*, 654 F. Supp. 3d at 306.  In short,
the "all natural" language is not misleading.

No reasonable consumer would conclude that a product contains artificial ingredients
merely because it is produced "in industrial factories" using "synthetic processes."  Indeed, that
is the way most consumer goods are produced.  *See, e.g.*, *Kelly v. Cape Cod Potato Chip Co.*, 81
F. Supp. 3d 754, 760 (W.D. Mo. 2015) (rejecting the definition of "natural" as a product
"existing [in] or produced by nature" "because the Chips are processed foods, which of course do
not exist or occur in nature"); *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973, 978 (C.D. Cal.
2013) (observing in dismissing a challenge to "All Natural" pasta that "the reasonable consumer
is aware that Buitoni Pastas are not springing fully-formed from Ravioli trees and Tortellini
bushes").

"A reasonable consumer would not think that a compound found in nature is artificial
even if it is produced in a different way than nature produces it, if the way it is produced is that it
is derived from a natural product and does not contain anything synthetic."  *Valencia*, 2024 WL
1158476, at *6; *see also id.* (dismissing GBL claims and observing that "Plaintiff alleges that the
fermenting process produces a broth containing citric acid and that the broth must be recovered
through chemical reactions with synthetic agents, but does not allege that the resulting citric acid
contains synthetic agents." (internal citation omitted)); *Parks v. Ainsworth Pet Nutrition, LLC*,
377 F. Supp. 3d 241, 247 (S.D.N.Y. 2019) (dismissing GBL claims challenging "natural"
labeling of pet food because the plaintiff does not allege that "the Products are composed of
unnatural ingredients" and "a reasonable consumer would not be so absolutist as to require that

'natural' means there is no glyphosate, even an accidental and innocuous amount, in the Products"); *Axon*, 354 F. Supp. 3d at 183 ("It is far more misleading to call a product 'natural' when the defendant has introduced unnatural ingredients than it is to call a product 'natural' when it contains trace amounts of a commonly used pesticide introduced early in the production process."); *In re General Mills Glyphosate Litig.*, 16-CV-2869, 2017 WL 2983877, at *6 (D. Minn. July 12, 2017) (stating that "[i]t is implausible that a reasonable consumer would believe that a product labelled as having one ingredient — oats — that is '100% Natural' could not contain a trace amount of glyphosate that is far below the amount permitted for organic products" and that "[i]t would be nearly impossible to produce a processed food with no trace of any synthetic molecule").[5]

Moreover, even if the "all natural" language was unclear, the Court must consider the context in which that statement was made. "[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018) (citation omitted) (alteration in original); *see also id.* ("[A]n allegedly misleading statement must be viewed in light of its context on the product label or advertisement as a whole." (internal quotation marks and citation omitted)). The defendant asserts that even if the "all natural" language was ambiguous, the additional language on the back of the package described the process by which the Splenda product was made. "[W]hen a

---

[5] The complaint cites the USDA's definition of synthetic ingredients, the FDA's policy on the use of the term "natural," and the Organic Foods Production Act's ("OFDA") definition of "synthetic." Those sources are not relevant in determining whether the "100% Natural" label would mislead a reasonable consumer acting reasonably. *See Valencia v. Snapple Beverage Corp.*, No. 23-CV-1399, 2024 WL 1158476, at *4 (S.D.N.Y. Mar. 18, 2024) ("Absent plausible allegations that the FDA's opinion influences that of the reasonable consumer, it is hard to see what relevance it has." (citation omitted)); *Henry v. Campbell Soup Co.*, No. 22-CV-431, 2023 WL 2734778, at *7 (E.D.N.Y. Mar. 31, 2023) (observing that "FDA regulations are 'without consequence' . . . and not probative of liability" for GBL claims (citation omitted)).

statement is ambiguous, every reasonable shopper knows that the devil is in the details and would seek clarification elsewhere on the package." *Adeghe v. Procter & Gamble Co.*, No. 22-CV-10025, 2024 WL 22061, at *3 (S.D.N.Y. Jan. 2, 2024) (citation omitted). The defendant's package included a description of the process by which the stevia was extracted — that the stevia leaves are steeped in water, the "sweet parts of the leaf" are extracted, the extract is separated, filtered, and purified, and the erythritol is fermented. (ECF No. 1 ¶ 41.) It also directed consumers to its website for further information about the process. (*See id.* ("Please see our website for more information on our natural standard: www.splenda.com/naturals.").) That additional language was sufficient to clear up any ambiguities about the defendant's product, which, the parties agree, is a "niche, specialty product" whose purchasers "are undoubtedly more likely to exhibit a higher standard of care." *La Rosa v. Abbott Lab'ys*, No. 22-CV-5435, 2024 WL 2022297, at *6 (E.D.N.Y. May 7, 2024) (quoting *Moore v. Trader Joe's Co.*, 4 F.4th 874, 881 (9th Cir. 2021)) (citation omitted); *see also Moore*, 4 F.4th at 884 (affirming dismissal where plaintiff challenged labeling of Manuka honey and observing that "an average consumer of Manuka honey would likely know more than most about the production of the product and the impossibility of a honey that is 100% derived from Manuka flower nectar").

For these reasons, the defendant's motion to dismiss the General Business Law deception claims is granted.

### c.     New York Law Omission Claim

A "plaintiff bringing an omission-based claim for [GBL] § 349 liability" must plausibly plead that "'the business alone possesses material information that is relevant to the consumer and failed to provide this information,' or that plaintiffs could not 'reasonably have obtained the relevant information they now claim the defendant failed to provide.'" *Paradowski v. Champion Petfoods USA, Inc.*, No. 22-CV-962, 2023 WL 3829559, at *2 (2d Cir. June 6, 2023) (quoting

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 20 (1995)).

The plaintiff states that "no reasonable consumer would know, or have reason to know, that the ingredients in Splenda Naturals Stevia are synthetic" and "that information was within the exclusive knowledge of Heartland." (ECF No. 1 ¶ 52.) As explained above, the plaintiff has not sufficiently pled that stevia leaf extract and erythritol are synthetic, which dooms their omission claim. *Hawkins*, 654 F. Supp. 3d at 306 (concluding that the "the lack of sufficient allegations here that the purportedly artificial flavors are in fact artificial is fatal to Plaintiff['s] claim that the ingredient list has made a material omission"). Accordingly, the New York law omission claim is dismissed.

### d.    New Jersey Consumer Fraud Act Claim

The New Jersey Consumer Fraud Act ("CFA") makes it unlawful for any person to use an "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[ ] concealment, suppression, or omission of any material fact . . . in connection with the sale or advertisement of any merchandise or real estate." *Chung v. Igloo Prods. Corp.*, No. 20-CV-4926, 2022 WL 2657350, at *9 (E.D.N.Y. July 8, 2022) (quoting *Dugan v. TGI Fridays, Inc.*, 231 N.J. 24, 51 (2017)); *see also* N.J. Stat. Ann. § 56:8–2. "To constitute consumer fraud . . . the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer . . . ." *Chung*, 2022 WL 2657350, at *9 (citation omitted). To state a claim under the CFA, the plaintiff must establish: "(1) unlawful conduct [by the defendant]; (2) an ascertainable loss [by the plaintiff]; and (3) a causal relationship between the defendant['s] unlawful conduct and the plaintiff's ascertainable loss." *Id.* (quoting *Hoffman v. Nissan Infiniti LT*, 840 F. App'x

694, 695 (3d Cir. 2021)).  "The New Jersey Supreme Court interprets ascertainable loss under the CFA to require a quantifiable or measurable injury and not [a] hypothetical or illusory harm." *Hoffman*, 840 F. App'x at 695.

There are two theories of ascertainable loss under the CFA: (1) the out-of-pocket loss theory and (2) the benefit-of-the-bargain theory.  For the out-of-pocket loss theory, a plaintiff must allege (1) "that he spent money, or in the future, needs to spend money, addressing the alleged NJ CFA violations, i.e., repair costs," or (2) that the products purchased were "essentially worthless" for their intended use.  *Annecharico v. Raymour & Flanigan*, No. 16-CV-1652, 2016 WL 7015615, at *7 (D.N.J. Nov. 30, 2016).  The plaintiff does not allege that he had to spend money on repair costs, or that the product was essentially worthless for its intended use, so the out-of-pocket loss theory does not apply.

To plead a loss under the benefit-of-the-bargain theory, the plaintiff must specify the price he paid for the product and the price of comparable products.  *Chung*, 2022 WL 2657350, at *10 (citing *Lieberson v. Johnson & Johnson Consumer Cos.*, 865 F. Supp. 2d 529, 541–42 (D.N.J. 2011)).  "Failure to quantify this difference in value results in the dismissal of a claim." *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 101 (D.N.J. Mar. 23, 2011).  The complaint does not include price information about Splenda Naturals Stevia and comparable sweeteners and does not explain how the amount that the plaintiff paid is a price premium.  Nor does the complaint include comparisons with cheaper products or any way to quantify the plaintiff's alleged loss.  Therefore, the plaintiff's allegation that he "would not have paid a premium price for the Product and would have purchased other, less expensive [sweeteners] is an unsupported conclusory statement and is insufficient to plead ascertainable loss based on price differences." *Chung*, 2022 WL 2657350, at *10.

The plaintiff has not established a cognizable injury under the out-of-pocket loss theory or the benefit-of-the-bargain theory.  Accordingly, the New Jersey CFA claim is dismissed.

### e.    New Jersey Law Breach of Express Warranty Claim

"A plaintiff making a breach of express warranty claim 'must properly allege: (1) that [the] [d]efendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description.'" *Vicente v. DePuy Synthes Cos.*, 570 F. Supp. 3d 232, 240 (D.N.J. 2021) (quoting *Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 706 (D.N.J. 2011)).  Under New Jersey law, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."  N.J.S.A. § 12A:2-313(2). New Jersey defines an "express warranty" as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

N.J.S.A. § 12A:2-313.  "A statement can amount to a warranty, even if unintended to be such by the seller, 'if it could fairly be understood . . . to constitute an affirmation or representation that the [product] possesse[s] a certain quality or capacity relating to future performance.'" *Hindermyer v. B. Braun Med. Inc.*, 419 F. Supp. 3d 809, 830 (D.N.J. 2019) (citation omitted). However, "an affirmation merely of the value of the goods or a statement purporting to be

merely the seller's opinion or commendation of the goods does not create a warranty."
N.J.S.A. § 12A:2-313(2). "[C]ourts have noted that 'whether a given statement constitutes an
express warranty is normally a question of fact for the jury.'" *Arlandson v. Hartz Mountain
Corp.*, 792 F. Supp. 2d 691, 706–07 (D.N.J. 2011) (citation omitted).

The plaintiff alleges that he "formed a contract with Heartland at the time [he] purchased
the Splenda Naturals Stevia Products[,]" and that the defendant made a promise and affirmation
on its packaging that these products were "100% Natural." (ECF No. 1 ¶ 104.) The plaintiff
asserts that he "was exposed to, read, and relied upon Heartland's labeling claim, '100%
Natural.'" *(Id.* ¶ 59.) The defendant argues that the plaintiff "cannot plausibly allege that TC
Heartland's labeling is likely to mislead reasonable consumers." (ECF No. 19-1 at 12 (citation
omitted).)

As the Court has already found, the plaintiff has not sufficiently pled that the labeling on
the defendant's product would mislead a reasonable customer acting reasonably. For the same
reason, his breach of express warranty claim must be dismissed. *See Hemy v. Perdue Farms,
Inc.*, No. 11-CV-888, 2011 WL 6002463, at *23 (D.N.J. Nov. 30, 2011) (grating motion to
dismiss breach of express warranty claims and New Jersey CFA claim where "Plaintiffs have
failed to allege any non-conclusory facts in support of their assertion that Perdue breached its
advertising-created agreement by failing to actually humanely raise their chickens"); *see also
Badalamenti v. Resideo Techs., Inc.*, No. 22-CV-5592, 2024 WL 4661010, at *3 (D.N.J. Nov. 4,
2024) (noting that a New Jersey breach of express warranty claim requires the plaintiff to show
"a false statement was made")*; Mladenov v. Wegmans Food Markets, Inc.*, 124 F. Supp. 3d 360,
378 (D.N.J. 2015) ("At its most basic, a breach of express warranty claim requires a plaintiff to

20

allege that she bought a product based on a particular promise regarding that product, which ultimately proved false.").

### f.    Intentional Misrepresentation Claim

A plaintiff claiming an intentional misrepresentation or fraud under New York law must allege that the defendant made "(1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015). "Similarly, in New Jersey, the five elements of [an intentional misrepresentation claim or] common law fraud are (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Chung*, 2022 WL 2657350, at *18 (internal quotation marks and citation omitted).[6]

Fraud claims are subject to the heightened pleading standard of Rule 9(b), which requires a plaintiff to "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015) (citation omitted). "Moreover, a 'fraud claim should . . . plead scienter, and although it may do so generally . . . the plaintiff must still allege

---

[6] The plaintiff asserts an "intentional misrepresentation" claim, which is analyzed like a "fraud" claim. *See Housey v. Procter & Gamble Co.*, No. 21-CV-2286, 2022 WL 874731, at *2, *3 (S.D.N.Y. Mar. 24, 2022) (construing the plaintiff's New York "intentional misrepresentation" claim as a New York "fraud" claim), *aff'd sub nom. Housey v. Proctor & Gamble Co.*, No. 22-888, 2022 WL 17844403 (2d Cir. Dec. 22, 2022); *compare Chung*, 2022 WL 2657350, at *18 (discussing five elements of a New Jersey fraud claim), *with Mason v. Coca-Cola Co.*, 774 F. Supp. 2d 699, 704 (D.N.J. 2011) (applying the same five elements to a New Jersey intentional misrepresentation claim).

facts that give rise to a strong inference of fraudulent intent.'" *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 472 (S.D.N.Y. 2020) (citation omitted). "A plaintiff may demonstrate this inference by (1) 'alleging facts to show that defendants had both motive and opportunity to commit fraud,' or (2) 'by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 353 (S.D.N.Y. 2020) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)).

The plaintiff alleges that the defendant knew that its "100% Natural" claims were "misleading, or has acted recklessly in making the misrepresentations, without regard to their truth" (ECF No. 1 ¶ 122) and that the defendant "intends that Plaintiff and other consumers rely on these misrepresentations" when making purchasing decisions (*id.* ¶ 123). The Court has already concluded that the labeling was not misleading. In any event, "a company's general profit motive is insufficient to plead scienter." *Hawkins*, 654 F. Supp. 3d at 309; *see also Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 585 (S.D.N.Y. 2021) ("Plaintiff asserts that 'Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front label, when it knew its statements were not true nor accurate[]' . . . . Such conclusory allegations fall short of the Rule 9(b) standard."); *Dash v. Seagate Tech. (U.S.) Holdings, Inc.*, 27 F. Supp. 3d 357, 362 (E.D.N.Y. 2014) (granting motion to dismiss New York fraud claim and finding that the plaintiff's allegation that "Defendant intentionally concealed and failed to disclose the true facts about the Thunderbolt Products for the purpose of inducing Plaintiff and the Class to purchase the Thunderbolt Products . . . is not enough to adequately plead fraudulent intent").

Accordingly, the plaintiff's misrepresentation claim is dismissed.

**CONCLUSION**

For these reasons, the defendant's motion to dismiss is granted, and the complaint is

dismissed.


**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge


Dated: Brooklyn, New York
       March 11, 2025